**Eloise Pepion COBELL, et al., Plaintiffs,**

v.

**Bruce BABBITT, Secretary of the Interior, Robert Rubin, Secretary of the Treasury, and Kevin Gover, Assistant Secretary of the Interior, Defendants.**

**No. Civ. 96–1285(RCL).**

United States District Court, District of Columbia.

Feb. 22, 1999.

charging defendants with a conspiracy to violate Section 1505. *See United States v. Hooker*, 841 F.2d at 1232–33.

Thaddeus Holt, Dennis M. Gingold, AU-KAMP & Gingold, Washington, DC, Keith M. Harper, Robert M. Peregoy, Native American Rights Fund, Washington, DC, for plaintiff.

Phillip Brooks, Susan Cook, U.S. Department of Justice, Washington, DC, Edith R. Blackwell, U.S. Department of Interior, Washington, DC, for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

### I. *Introduction*

This matter comes before the court on the court's December 18, 1998 Order to Show Cause. In that order, the court required defendants Bruce Babbitt, Secretary of the Interior; Robert Rubin, Secretary of the Treasury; and Kevin Gover, Assistant Secretary of the Interior to "show cause why they should not be held in civil contempt of court" or "sanctioned for their failure to comply with the Orders of this Court as set forth in plaintiffs' [Consolidated Motion for Order to Show Cause Why Defendants Should Not Be Held in Contempt and for Sanctions for Failure to Comply With Court Orders]." [1] After receiving Defendants' Memorandum

---

1. At the outset, the court notes that the order to show cause proposed by the plaintiffs included as parties to the contempt trial "Defendants and their employees responsible for this case, including their attorneys." *See Plaintiffs' Motion* Proposed Order, filed December 9, 1998. This wording was apparently chosen because the plaintiffs' motion alleges acts taken by Department of Interior employees and their attorneys which, if proven, would be contemptuous.

Later, the defendants filed a motion seeking to remove all names of defendants' employees and agents, and to hold responsible only the "Defendants," which would include only the two Secretaries and the Assistant Secretary. *See Motion for Leave to File Alternative Form of Order* Proposed Order, filed December 16, 1998. The court granted defendants' motion. Therefore, to the extent that Secretary Babbitt, Secretary Rubin, and Assistant Secretary Gover are the only parties to be held responsible by this court's order today, it is by their own choice, since they (through their counsel) consented to their agents and attorneys removing themselves from formal responsibility (despite the plaintiffs' allegations). Although it does so with some pause, the court must assume that counsel had the permission of their three clients to ask the court to hold only the defendants, and not their agents or attorneys, responsible for the failure to comply with this court's orders. It is not the court's place, however, to pierce the attorney-client relationship to see whether the clients expressly and actually authorized the attorneys to take the position that only the defendants should be held in contempt.

At the pre-trial hearing held on January 6, 1999, the court said that the defendants were not required to personally attend the contempt trial, but if they did not, it would be at their own risk. Transcript of January 6, 1999 Status Conference, at 17. None of the three defendants ever attended or testified.

of Points and Authorities in Response to the Court's Order to Show Cause Why Defendants Should Not Be Held in Contempt and or Sanctioned, the court held a two-week contempt trial.

Upon consideration of the evidence presented and representations made at the contempt trial and contained in both parties' briefs, the court finds that Secretary Babbitt, Secretary Rubin, and Assistant Secretary Gover are in civil contempt of this court's First Order of Production of Information, issued November 27, 1996 and subsequent Scheduling order of May 4, 1998. Accordingly, the court will impose compensatory, monetary sanctions on the defendants and will appoint a special master to oversee the administration of this case, as discussed and ordered below. The court finds these remedies to be necessary in light of the defendants' flagrant disregard for the orders of this court and the defendants' corresponding lack of candor in concealing their wrongdoing.

## II. *Legal and Factual Background*

### A. *Applicable Civil Contempt Standards*

■ A federal district court has two bases for finding a party or its attorneys in civil contempt of that court's discovery order. First, pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure, the court can hold in contempt and sanction a party for "fail[ing] to obey an order to provide ... discovery." FED.R.CIV.P. 37(b)(2). Second, the court has the "inherent power to protect [its] integrity and prevent abuses of the judicial process" by holding parties in contempt and ordering sanctions for violations of the court's orders. *Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C.Cir.1998) When the source of the potential civil contempt is a failure to comply with a discovery order, the analysis under both of these bases is "essentially the same." *Id.*

■ Two requirements must be met before a party or its attorneys may be held in civil contempt. First, the court must have fashioned an order that is clear and reasonably specific. *Armstrong v. Executive Office of the President, Office of Administration*, 1 F.3d 1274, 1289 (D.C.Cir. 1993). Second, the defendant must have violated that order. *Food Lion v. United Food and Commercial Workers Internat'l Union*, 103 F.3d 1007, 1016–17 (D.C.Cir. 1997); *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1146 (9th Cir.1983); *In re Baum*, 606 F.2d 592, 593 (5th Cir.1979). Generally, to properly hold a party or its attorneys in civil contempt, the court must find facts meeting these two elements by clear and convincing evidence. *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1183–84 (D.C.Cir.1981); *Washington–Baltimore Newspaper Guild v. The Washington Post Co.*, 626 F.2d 1029, 1031 (D.C.Cir.1980).[2] In this circuit, a finding of bad faith by the contemnor is not required, and "the [contemnor's] failure to comply with the court decree need not be intentional." *Food Lion*, 103 F.3d at 1016 (quoting *Blevins Popcorn Co.*, 659 F.2d at 1183)).

■ To rebut a prima facie showing of civil contempt, the contemnor may assert the defense of "good faith substantial compliance."[3] To prove this defense, the

---

**2.** The standard of proof may sometimes be lowered with regard to certain issue-related sanctions in the civil contempt context, such as drawing negative inferences. *See Shepherd v. ABC, Inc.*, 62 F.3d 1469, 1477–78 (D.C.Cir. 1995). In that context, a preponderance of the evidence standard would govern. *See id.* The court has no occasion to apply such a standard in this case. Although the plaintiffs allude to issue-related evidentiary sanctions in their motion, *see Plaintiffs' Motion* at 25, they abandoned this request at the conclusion of the contempt trial. *See* Transcript at 1463–1465. Therefore, the clear and convincing standard applies to this case.

**3.** Although the viability of this defense has not been squarely resolved in this circuit, *see Food Lion*, 103 F.3d 1007 at 1017, the plaintiffs have not made such a challenge in this case. Thus, the court will not address this issue as no objection has been raised.

contemnor bears the burden of proving that it "took all reasonable steps within [its] power to comply with the courts order." *Food Lion,* 103 F.3d at 1017 (citations omitted). Importantly, the defense has two distinct components—(1) a good faith effort to comply with the court order at issue; and (2) substantial compliance with that court order. *See id.* A good faith effort may be a factor in deciding whether a contemnor has substantially complied, and it may be relevant to mitigation of "damages;" however, good faith alone does not excuse contempt. *Id.* at 1017–18. Moreover, "[c]ourts have been particularly unsympathetic to purported excuses for less-than substantial compliance where the contemnor has participated in drafting the order against which compliance is measured." *United States v. Tennessee,* 925 F.Supp. 1292, 1302 (W.D.Tenn. 1995). When a party participates in drafting the relevant order, it does (or is held to have done) so "with an understanding of what it can reasonably accomplish." *Id.* When that same party fails to live up to its own expectations which have subsequently been embodied in a court order, it should, at the very least, notify the court and move for an enlargement of time. For if the party and its attorneys sit idly by, they run the risk of contempt of court.

■ A civil contempt action is "a remedial sanction used to obtain compliance with a court order or to compensate for damages sustained as a result of noncompliance." *Food Lion,* 103 F.3d at 1016. Upon a finding of civil contempt, the court has several remedies at its disposal to meet the dual purposes of compliance and compensation. In this regard, Rule 37(b)(2) specifically authorizes the following:

[T]he court in which the action is pending may make such orders in regard to the failure [to comply] as are just, and among others the following:

(A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence;

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;

(D) In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

. . .

In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust.

FED.R.CIV.P. 37(b)(2). Thus, Rule 37 provides some specific, nonexclusive remedies available to the court, with the parameters of the available measures being "such orders in regard to the failure as are just." *See id.*

The remedies available for a citation of civil contempt of court based upon the inherent powers of the court are largely the same. As the Court of Appeals for the District of Columbia Circuit has stated, "the inherent power enables courts to protect their institutional integrity and to guard against abuses of the judicial process with contempt citations, fines, awards of attorneys, fees, and such other orders and sanctions as they find necessary, in-

cluding even dismissals and default judgments." *Shepherd,* 62 F.3d at 1472; *see also id.* at 1475 ("The inherent power encompasses the power to sanction attorney or party misconduct.... Other inherent power sanctions available to courts include fines, awards of attorneys' fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence."). The remedies drawn upon under the inherent power, however, should be exercised only when the rules do not provide the court with sufficient authority to protect their integrity and to prevent abuses of the judicial process. *Id.* at 1474 (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). Therefore, when a discovery order has been violated, the court should turn to its inherent powers only as a secondary measure.

### B. Factual Background

The underlying facts in this case are discussed at length in one of this court's earlier opinions in this matter. *See Cobell v. Babbitt,* 30 F.Supp.2d 24 (D.D.C. 1998). For this reason, the court will begin by highlighting only a few of the basic background facts pertinent to the discussion at hand. The opinion will then turn to the pertinent background facts regarding document storage and production.

This class-action suit stems from the government's alleged mismanagement of the Individual Indian Money (IIM) trust accounting system. In this system, the United States acts as trustee of accounts that hold money on behalf of individual Indian beneficiaries. These accounts allegedly hold approximately four billion dollars.

The IIM accounts hold money that originates from various sources, but a majority of the funds are derived from income earned off individual land allotments. These allotments date back to 1934, pursuant to a United States government policy of breaking up Indian tribes and tribal lands. In implementing this policy, the bulk of the tribal lands were divided into tracts, generally of 80 or 160 acres. These tracts were patented to individual Indians, with legal title held by the United States as trustee. The government's involvement was originally intended to provide banking services for "legally incompetent Indian adults" and Indian children without legal guardians. *See* Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund, H.R. No. 102–499 (1992). These land allotments held in trust by the government generated income by the lease of their grazing, farming, timber, and mineral rights.

At the most general level, this suit involves the government's management of the IIM trust accounting system. This court has already certified the named plaintiffs under FED.R.CIV.P. 23(b)(1)(A) and (b)(2) as representatives of a class consisting of all present and former beneficiaries of the IIM accounts. This class purportedly includes at least 300,000 individual Indian beneficiaries.

The plaintiffs generally seek two types of relief. First, in what has become known as the "retrospective" prong of the case, the plaintiffs seek a formal accounting of the IIM accounting system. Second, in the so-called "prospective" component, the plaintiffs seek a court order requiring the government to bring their accounting practices in conformity with their trust obligations under statutory and common law.

Because the matter currently before the court arises out of civil contempt proceedings related to document production in the underlying case, a general background discussion on the current structure of the management and document storage systems administered by the defendants is required.

With the exception of defendant Rubin, Secretary of the Treasury, the named defendants fall within the Department of the Interior. Since the Office of the Special

Trustee (OST) was created by Congress in 1994, the document management "system" has been primarily a divided one. OST was tasked by statute with the management and reform of the financial side of administering the IIM trust system. OST has its records headquarters in Albuquerque, New Mexico.[4]

While OST must manage the financial aspects of the IIM system, the Bureau of Indian Affairs (BIA)—which is completely independent of OST—takes responsibility for the realty side of the trust management system throughout the country. BIA is divided up into twelve area offices around the nation; each area contains agency offices, of which there are approximately 92 in the United States.

It should be noted that this description of the Department of Interior structure with regard to IIM administration is an oversimplification. Other branches of the Department clearly manage records that are relevant to IIM administration. For example, the Minerals Management Services and the Bureau of Land Management each have custody and control over certain documents that pertain to the IIM system, such as producing oil and gas leases. Moreover, the Federal Records Centers and the Federal Archives may each house a substantial number of IIM trust-related documents, since each of the relevant governmental entities may send their archived documents to these locations.

Within this decentralized structure, the document storage situation becomes even more intricate. In short, OST and BIA each maintain documents that the other needs. The most general example would

be a lease on a piece of land owned by an IIM beneficiary. BIA would need the lease from the realty management standpoint, but OST would also need the lease because it may generate income that would be credited to the lessor's IIM account. Today, OST houses most of the financial documents relevant to the five named plaintiffs in its warehouses in Albuquerque, New Mexico. The BIA, however, still maintains its documents at the area and agency levels throughout the country.

In terms of document production and trust administration, this decentralized system—which the Department of Interior (with the help of Congress) has created for itself—clearly places a premium on coordination and management. To effectively, efficiently, and reasonably produce documents responsive to the court's orders, clear and accurate instructions would need to be given by the attorneys to the field staff, who would ultimately carry out the actual document production. Of course, if the defendants' attorneys handling this matter needed reasonable enlargements of time along the way, they would be well advised to be candid with the court. Unfortunately, the well coordinated, closely managed, and candid approach required for reasonable document production and case management has not been taken by the defendants or their attorneys. The defendants must suffer the consequences for these failures.

### III. Analysis

#### A. Introduction

The issue before the court today is whether the defendants should be held in

---

4. The OST is currently undergoing a major overhaul, purportedly as a result of the facts underlying the current contempt proceeding. By Secretarial Order, defendant Babbitt transferred Joe Christie, Special Assistant to the Special Trustee, to another job assignment. Paul Homan, the former Special Trustee, resigned shortly thereafter. These changes, including Secretary Babbitt's order, occurred shortly before the contempt trial but soon after a newspaper article discussing the pending contempt proceedings appeared in *The Washington Post*. It was this newspaper

article that was the catalyst for the structural change at OST. *See* Transcript at 1135. Congress has asked that the Department of the Interior submit to the Senate Committee on Indian Affairs a report detailing the rationale behind the restructuring, in addition to a brief update on trust funds reform implementation. *See* Plaintiffs' Exhibit # 13 (Letter from Senator Ben Nighthorse Campbell); *see also* Plaintiffs' Exhibit # 12 (Letter from Senator John McCain expressing concern over the OST reorganization).

contempt for not complying with two of the court's document production orders, one of which was issued over two years ago. The defendants' document production failures are undoubtedly related to the plaintiffs' allegations of trust mismanagement because the defendants' record-keeping "system" is so decentralized and disorganized that it will not allow them to produce documents with the normal effort that it should take a responsible trustee. The testimony of Paul Homan, former Special Trustee, substantiates this proposition. Homan testified that "[t]he record-keeping system [for the IIM accounts] is the worst that I have seen in my entire life." Transcript at 639. This is especially credible testimony, coming from the person appointed by the President and confirmed by the Senate, whose specific task was to oversee and reform the IIM trust system which the plaintiffs attack. Moreover, Homan has a vast experience in trust management and with failing financial institutions. For five years, Homan directly supervised the trust operations of the Comptroller of the Currency, which licenses and supervises trust companies owned by national banks. Transcript at 599. Homan also served as chief executive officer of First Florida Bank, which had a trust department that exceeded $5 billion, and as chief executive officer of Riggs Bank. Thus, given Homan's unique duties and relevant experience, his commentary on the IIM system's disarray is extremely noteworthy.

More immediately troubling, however, are Homan's statements that, in his opinion, the OST will become less, rather than more, responsive, due to a reorganization of OST by Secretary Babbitt. *See supra* note 4 (discussing OST's reorganization). Homan's prediction has already come to fruition in one concrete aspect. At the November 24, 1998 hearing, John Miller, Deputy Special Trustee for Policy, OST, was called by the government to testify on the time needed for OST to complete document production. Miller testified that the document "clean-up" effort—*i.e.,* completing the protocol to eliminate the potential for hantavirus infection—would be finished in February 1999, so that OST boxes could begin being searched at that time. *See* Transcript of November 24, 1998 Hearing, at 91. Miller stressed that this estimate could be followed (or else he would notify the court to the contrary) because the Assistant Secretary had dedicated $6.9 million for Miller to carry out this project. *Id.* at 119. Secretary Babbitt's reorganization of OST, however, has stripped Miller of his authority (and funding) to carry out his prior representations, thereby preventing the clean-up effort from being finished on the represented time frame. For this reason, Miller wrote a letter to the court and the parties stating that he will be unable to carry out the document production efforts as he represented at the November hearing due to Secretary Babbitt's recent reorganization of OST. *See* Letter of January 8, 1999, from John M. Miller to the Court (filed January 11, 1999). Miller explicitly stated in this letter as the reason for his inability to timely comply that "Secretary [Babbitt] has transferred the funds out of my control and withdrew my line authority." *Id.* In short, Miller's recent statements provide strong support for Homan's prediction that the Secretary's reorganization will hinder defendants' compliance with this court's orders. Indeed, the prediction has already come true, as the OST documents will not begin to be searched until at least March 1999. *See* Transcript of February 16, 1999 Status Call, at 7–8. This lends further credence to the court's finding of contempt in this case, which stems from the noncompliance, lack of good faith, cover-up, and misconduct discussed with specificity below.

The way in which the defendants have handled this litigation up to the commencement of the contempt trial is nothing short of a travesty. Yet, despite the largely undisputed facts that evidence clear contempt of this court's orders, the Assistant Secretary of the Interior proclaims that "I

consider this, as the Secretary does, the most important pressing management issue the Department [of Interior] faces." Transcript at 1114.

The court's response to this, and the plaintiffs' rallying cry for decades with regard to IIM trust management, can only be that actions speak louder than words. The Assistant Secretary himself paraphrased this idea when he testified that he "manages by results." Transcript at 1190. Whether the measuring stick is the defendants' actions or the results they have achieved, the grade is the same—the defendants have failed miserably.

The defendants' statements regarding the importance of this litigation are belied by their actions, as discussed in detail below. As usual, and aside from the true issues at the contempt trial, the defendants continue to represent that the check is in the mail with regard to document production. The defendants point to Kenneth Rossman as one of the answers to their problems. Rossman is the newly installed Director of the recently created Office of Trust Litigation Support and Records for OST. This position was created during the recent OST reorganization. *See supra* note 4. Yet, even the circumstances of Rossman's appointment contradict the notion that the defendants care about complying with this court's orders. Rossman was originally detailed on October 13, 1998, from the State Department to do a study on document management reform for the IIM system as a whole. Although the defendants had been in defiance of this court's orders for four months at that point, the defendants still chose to spend Rossman's efforts for the following three months on the defendants' long range plan, as opposed to bringing the defendants into compliance with this court's orders. Given this type of high-level decisionmaking at the Department of the Interior, the defendants to this contempt proceeding would be well advised to make sure that their respective Departments' actions live up to their words. For

if they do not, the defendants will suffer consequences far greater than those being handed down today. Like the Assistant Secretary of the Interior, this court will be managing by results.

B. *Order to Show Cause*

Before turning to the contempt analysis, it is useful to briefly address how the order to show cause came to be issued. The court notes that it had no desire to hold the defendants in contempt unless absolutely necessary. Indeed, plaintiffs' counsel states that, to his knowledge, no sitting Secretary in modern times has been held in contempt of court. Transcript at 1463.

Contrary to the impression some would seek to create, I do not relish holding these cabinet officials in contempt. And I do so today more out of sadness than anger. But courts have a duty to hold government officials responsible for their conduct when they infringe on the legitimate rights of others. These officials are responsible for seeing that the laws of the United States are faithfully executed. In this case, the laws—the orders of this court—were either ignored or thwarted at every turn by these officials and their subordinates. The court must hold such government officials accountable; otherwise, our citizens—as litigants—are reduced to mere supplicants of the government, taking whatever is dished out to them. That is not our system of government, as established by the Constitution. We have a government of law, and government officials must be held accountable under the law.

The court tried to take reasonable alternative steps to allow the defendants to bring themselves into compliance with the court's stipulated document production order of November 27, 1996 ("First Order of Production of Information"), and its subsequent Scheduling Order of May 4, 1998, which placed the final deadline on the pertinent document production. But the court is left with little choice when the

alternative avenues have been exhausted without avail.

The situation crystalized at the end of the second day of a November 1998 hearing the court held regarding setting a trial date in the retrospective part of this case. This hearing was yet another attempt by the court, in part, to allow the defendants to explain their noncompliance. But at the end of the hearing, when the court was trying to set another status conference on the state of document production compliance by defendants, the following exchange occurred:

[The Court:] Okay. Let's plan on 10:00 a.m. on the 4th, and this will be on the status of compliance with plaintiffs, the five plaintiffs' records.

[Mr. Wiener:] Your Honor, is it possible to schedule this at a point where plaintiffs can at least submit something in writing, so we know what the issues are? I kind of feel like we've been ambushed here.

[The Court:] They said you haven't given them everything I've ordered produced. I think that's the issue.

. . .

[Mr. Wiener:] Well, but is that the issue? I mean, it seems to be somewhat of a moving target here, and if that's the issue, that's fine.

. . .

[The Court:] Let's do it this way. He wants a written submission. File a motion for an order to show cause why I shouldn't hold the government in contempt. Get that in, and I'll set a hearing on the contempt motion, and we'll have it all in writing that way.

Transcript of Hearing, Nov. 24th, 1998, at 213–14.

The orders of this court are simply not moving targets. Because twenty-six months had passed since the original production order was issued and the defendants had not even come close to bringing themselves into compliance, as discussed below, the court's last available option was to proceed by contempt.

But before formally issuing the order to show cause, the court was willing to give the defendants one final opportunity to avoid a contempt trial. At the status call held December 15, 1998, one week after plaintiffs filed their motion for an order to show cause, the defendants reported to the court on the state of document production. When defendants' lead counsel, Lewis Wiener, ended his report without mentioning a word about the potential for an Order to Show Cause, the following exchange occurred:

[The Court:] In the Motion for Order to Show Cause, you wanted written specifications. So you've got it here filed December 9. What is your proposal about having the Court deal with that?

[Mr. Wiener:] Dismiss it.

Transcript of Status Call, Dec. 15, 1998, at 7. This type of response, to the potential for an order to show cause, is indicative of the manner in which this case has been handled by defendants' counsel.

The court's opinion as to the necessity of a contempt trial was finalized at the December 15, 1998 status call for an additional reason. As discussed below, some of plaintiff La Rose's IIM documents were located at the BIA Winnebago Agency Office in Nebraska. One of the defendants' excuses for not producing these documents has been that the potential for hantavirus contamination existed at the Winnebago facility. However, defendants represented at the beginning of the November 23, 1998 hearing that this problem was resolved and that documents for plaintiff La Rose would begin to be produced "immediately." Transcript of November 23, 1998 Hearing, at 26 ("We have confirmed that there is no hantavirus contamination at the Winnebago site, and the collection of those documents can begin immediately.") At the December 15, 1998 status call, however, the court learned that these representations were totally inaccurate. On Decem-

ber 15, 1998, defendants' counsel admitted to the court that the Winnebago site was not cleared of potential hantavirus contamination. Transcript of December 15, 1998 Status Call, at 7–10. Consequently, defendants stated that it would be another three days until they could begin document production from the Winnebago site. Thus, the representations to the court on this issue had completely changed, but the defendants never advised the court in the interim that their prior statements had been erroneous. This misbehavior is especially egregious considering that it occurred six months beyond the document production deadline.

The Order to Show Cause was originally issued at the end of that hearing, and later memorialized in writing. Defendants' counsels' next move was to remove themselves (and their clients' employees) from the Order to Show Cause, as discussed above. *See supra* note 1.

The court finds by clear and convincing evidence that defendants Bruce Babbitt, Secretary of the Interior; Robert Rubin, Secretary of the Treasury; and Kevin Gover, Assistant Secretary of the Interior are in civil contempt of this court's orders of November 27, 1996 and May 4, 1998.

### C. *Contempt*

#### 1. *Clear and Reasonably Specific Order*

■ The first element of a civil contempt analysis is whether the court has entered an order that is clear and reasonably specific. *Armstrong*, 1 F.3d at 1289. The court must employ an objective standard when making this assessment. *See United States v. Young*, 107 F.3d 903, 907 (D.C.Cir.1997). This objective test includes the language of and circumstances surrounding the issuance of the order. *See id.* In analyzing the matter at hand, the court bears in mind that ambiguity is far less likely to be found when the order at issue was proposed and consented to by the contemnor. *See Glover v. Johnson*, 934 F.2d 703, 708–09 (6th Cir.1991) ("It suffices to say that the 1981 final order

was a negotiated settlement between the parties. Defendants did not object to the language until now and have never asked the district court to clarify the purportedly ambiguous language. Moreover, we find the language unambiguous and, even if it were ambiguous, defendants' failure to request the court to clarify, explain, or modify the language in the decade since the order was served precludes raising an ambiguity argument at this time."); *State of Tennessee*, 925 F.Supp. at 1302 ("Courts have been particulary unsympathetic to purported excuses for less-than-substantial compliance where the contemnor has participated in drafting the order against which compliance is measured."); *see also Spallone*, 493 U.S. at 276, 110 S.Ct. 625 (upholding a contempt finding against a contemnor that failed to meet the requirements of a consent decree). With these legal principles in mind, it is apparent that the pertinent orders of this court were clear and reasonably specific.

■ On November 27, 1996, the court entered its First Order of Production of Information. This contempt proceeding arises out of the defendants' noncompliance with paragraph 19 of that Order. Paragraph 19 requires defendants to produce "[a]ll documents, records, and tangible things which embody, refer to, or relate to IIM accounts of the five named plaintiffs or their predecessors in interest." First Order of Production of Information ¶ 19.

The language of the November 27, 1996 Order is clear and reasonably specific. Even the defendants admit that this language is "facially plain." Defendants Response at 8. Of course, this concession merely reflects pride of authorship—the defendants proposed, participated in the drafting of, and consented to this language themselves. Accordingly, the defendants cannot be allowed to explain away their noncompliance by relying on their own erroneous drafting. At any rate, it seems impossible for paragraph 19 to have been

any clearer. It is ironic, however, that the one thing the defendants have done an outstanding job on in the handling of this case—*i.e.,* the drafting of paragraph 19—is the very thing they seek to categorize as ambiguous. For these reasons, the court finds the November 27, 1996 First Order of Production of Information to be clear and reasonably specific.

The defendants did not emphasize their ambiguity argument at the contempt hearing. Defendants raise only one such argument today, through their brief, and it is without merit. Defendants contend that paragraph 19, as quoted above, somehow meant that they only needed to produce "land related source documents," meaning documents relating to income producing properties managed by BIA. Defendants' Response at 8. This interpretation is erroneous. Although the set of documents that would be produced under defendants' unilateral re-interpretation of paragraph 19 would surely be subsumed by the Order, that language does not equate to "all documents … which … relate to IIM accounts of the five named plaintiffs or their predecessors in interest." First Order of Production of Information ¶ 19. For instance, such a definition would not include documentation of debit transactions. Transcript at 433–434; 437.[5]

The defendants' ambiguity arguments must be looked upon with suspicion given three additional factors. First, the defendants have attempted to rely on other tortured and self-serving interpretations of paragraph 19 before. In one (but not the only) instance, defendants' lead counsel espoused the view that the word "or" in paragraph 19 meant that defendants only had to produce documents for the five named plaintiffs or their predecessors in interest. *See* Transcript of November 23, 1998, at 82–83. This interpretation was urged in November 1998, after the court inquired why "predecessor-in-interest"

documents had not been produced when paragraph 19 plainly states that documents must be produced for the "predecessors in interest" of the five named plaintiffs. Defendants' lead counsel responded with the following argument which, not surprisingly, is not advanced today:

> [By Mr. Wiener:] [Plaintiffs] say they have no documents on predecessor accounts. The Court's order says documents for the five named plaintiffs or their predecessor accounts. It doesn't say "and," it says "or." We are producing and trying to produce, and are representing to this Court today what we are doing to produce those documents for the five named plaintiffs. If they want documents for the predecessor accounts in lieu of documents for the five named plaintiffs, then we can talk about how we're going to produce documents for them. But we are proceeding in good faith, Your Honor.

Transcript of November 23, 1998, at 82–83. As can be seen from the plain text of paragraph 19 and the context of this case, this interpretation defies all logic. The defendants had (and still have) an obligation to produce all documents that related to the IIM accounts of the five named plaintiffs or their predecessors in interest. This is the only logical reading, even aside from the order's plain language, because the entire retrospective aspect of this suit involves an accounting. It would indeed be a great feat to do an accounting for the five named plaintiffs without any documents relating to the five named plaintiffs (but instead only their predecessors in interest), as defendants' counsel's interpretation would allow. This is certainly not the only instance of creative interpretation by the defendants, but it is a telling example.

Second, the court views the defendants' ambiguity argument with skepticism because the defendants' agency attorney,

---

5. The court's discussion of actual noncompliance, *infra,* will further show the differences between what was ordered and what was actually produced. Debit transactions are simply the most obvious example.

who was in charge of document production, *see* Defendants' Response at 16, did not know what the language of the order meant from the outset. In the words of defendants' counsel at closing arguments, "Willa Perlmutter sat down to try to negotiate an agreed order with the plaintiffs.... Ms. Perlmutter obviously didn't understand what she had just agreed to." Transcript at 1469. While defendants' counsel's candor is certainly a refreshing change, the substance of the statement captures the true basis for defendants, misunderstanding of paragraph 19—that is, misinterpretation, not ambiguity.

Third, the court notes that the defendants could not even figure out to whom the order applied. As will be discussed below, the Department of Treasury did not begin to attempt to produce any relevant documentation until November 1998, five months after the deadline for compliance had passed. *See* Transcript of November 24, 1998 Status Hearing, at 172–173. Defendants' explanation in this regard was that "the November 27, 1996 order ... was an order that came out of the [Department of Interior's] Solicitor's Office. People weren't thinking. They were thinking that it was a Department of Interior order, that the Department of the Interior had to produce the documents." Transcript at 1491. Again, the Treasury counsel's interpretation is breathtaking, given that the Secretary of the Treasury was a named defendant and the First Order of Production of Information says "defendants shall." Moreover, the Department of the Treasury sent an agency lawyer, Daniel Mazella, to nearly all of the status conferences in this case.

In summary, paragraph 19 of the First Order of Production is clear and reasonably specific when viewed objectively. Moreover, the defendants have little ground to stand on in terms of an ambiguity argument because they drafted the language. Indeed, defendants' own brief states that the language was "facially plain." Defendants' Response at 8. Final-

ly, the defendants' strained interpretations are nothing new and can be adequately explained by the fact that the attorney drafting the language "didn't understand" what she was doing. But even absent a waiver by the proposal and endorsement of the language, the defendants, unilateral misinterpretation cannot create an ambiguity when one does not exist.

### 2. *Noncompliance with the November 27, 1996 and May 4, 1998 Court Orders.*

Before turning to the factual noncompliance issue, it is helpful to make two preliminary points: first, regarding the specific legal standards applicable to the noncompliance aspect of civil contempt; and second, regarding matters not in dispute in the present case.

To complete their prima facie case of civil contempt, the plaintiffs must show that the defendants failed to obey an order of this court. FED.R.CIV.P. 37(b)(2). To the extent the plaintiffs seek to prove their case based on the inherent powers of this court, as opposed to Rule 37 of the Federal Rules of Civil Procedure, the analysis is essentially the same. *Webb,* 146 F.3d at 971–72 & n. 16. If the plaintiffs meet this burden, then the defendants must then show good faith and substantial compliance as a defense. *Food Lion,* 103 F.3d at 1017–18. To do so, the defendants must demonstrate that they took "all reasonable steps within [their] power to comply with the court's order." *Id.* at 1017.

The defendants admit that they are not in compliance with the court's November 27, 1996 and May 4, 1998 Orders. *See* Defendants' Proposed Order Regarding Document Production for the Five Named Plaintiffs ¶ 3; Transcript at 18, 1465–1467. Because the court has already found that the two pertinent orders are clear and reasonably specific, the burden therefore lies on the defendants to prove their good faith and substantial compliance. *Id.* The defendants have failed to meet their burden.

Paragraph 19 of the court' November 27, 1996 First Order of Production required all of the defendants to produce "[a]ll documents, records, and tangible things which embody, refer to, or relate to IIM accounts of the five named plaintiffs or their predecessors in interest.". First Order of Production of Information ¶ 19. This language was proposed to the court by agreement of the parties. Transcript of November 27, 1996 Status Call at 3. As proposed by the parties, this first order required production "as soon as practicable." First Order of Production of Information at 1. Only ten days after the original order's issuance, the plaintiffs began to notify the court (in open court) that the defendants were not proceeding with document production as represented. *See* Transcript of December 6, 1596 Status Call at 5. In this regard, the plaintiffs requested that the court place a "cutoff date" into the first production order. *See id.* at 5. The court declined to set a date-certain deadline for document production under the first order, based in part on representations by defendants' counsel that his clients were "working [their] hardest to meet the orders of this Court." *Id.* at 10. Under the assumption that the government was proceeding to produce the information that they proposed be produced as soon as practicable—as they were ordered and obligated to do—the court did not place a date-certain deadline on compliance with its November 27, 1996 Order until May 4, 1998. The date ordered by the Court in the May order was June 30, 1998. *See* Scheduling Order of May 4, 1998. Based upon the record, the court finds that the defendants have not substantially complied nor attempted in good faith to comply with either of this court's pertinent production orders.

### (a) *No Substantial Compliance*

█ The defendants bear the burden of proving that they substantially complied with this court's November 27, 1996 and May 4, 1998 Orders. The defendants fall far short of meeting this burden for several reasons.

First, the defendants correctly state that the measuring stick for substantial compliance should be the percentage of documents produced that in fact exist, not simply the number of documents produced that should in theory exist. *See* Defendants' Response at 5. The attorneys handling this matter for the defendants, however, created a substantial hurdle for themselves, even under their own standard. Specifically, neither the defendants' attorneys nor anyone else kept a consistent log or index of documents that had been produced to the plaintiffs or received from the relevant field offices. *See* Transcript at 100–102 (Q: So you really don't know what has been produced then, specifically, do you? A: That's correct.); 192 ("And if we had a log—if we'd ... had a log, then we wouldn't be having this discussion, because I could throw it up here and say, there it is right there, Judge."); 304 ("Q: Was there a log that accompanied that package by any chance? A: No."); 1264–1265 ("Q: Did you ever get in the documents from BIA? A: Yes, we did. ... Q: Did you prepare a log of those documents? A: No, I'm afraid to say I didn't.") Willa Perlmutter, the attorney from the Department of Interior who was originally in charge of document production for the defendants, stated that she did not keep a document log because "it was more efficient for me to provide the documents to the Justice Department for production and for me to just keep working on collecting the information that was being requested by the plaintiffs." Transcript at 1265. This was a reckless approach to managing document production from the outset, especially in light of defendants' counsel's representations to the court as early as January 21, 1997 that "this [case] is a massive piece of litigation." Transcript of January 21, 1997 Status Conference, at 16. The incompetence was compounded when the Department of Justice attorneys failed to require Perlmutter to do a document log and neglected to do the

job themselves. In the court's view, the only efficiency provided by failing to keep a document production log in a massive class action case in which documents are crucial is the efficiency provided to the plaintiffs in proving their case for civil contempt. It is an uphill battle for the defendants to attempt to argue that they have substantially complied with document production orders when they cannot readily show what documents they produced.

Second, the defendants did not substantially comply with paragraph 19 of the court's November 27, 1996 Order because no "predecessor-in-interest" documents have been produced. The plain language of the Order clearly requires the defendants to produce these documents. *See* First Order of Production of Information ¶ 19 ("Pursuant to the Stipulation of the parties . . . it is hereby ordered that defendants furnish to plaintiffs as soon as practicable . . . [a]ll documents, records, and tangible things which embody, refer to, or relate to IIM accounts of the five named plaintiffs *or their predecessors in interest.*" (emphasis added)). In addition, the testimony of the defendants' document production records managers comports with the plain language. Joe Christie, the person in charge of document production for the Office of the Special Trustee, admitted at the contempt trial that he believed this language included no time limitation and, assuming that the option was not to produce documents for the five named plaintiffs *or* their predecessors,[6] then the Order required document production for all predecessors of the five named plaintiffs. *See* Transcript at 728–729. Larry Scrivner, Chief of the Realty Division of the Bureau of Indian Affairs, admitted at the contempt trial that as early as May 1997 he came to understand that predecessor-in-interest documents were required by the court's order. *See* Transcript at 95–96. Thus, the two field leaders of the document production effort either originally believed that predecessor-in-interest documents were

required or, in Scrivner's case, came to this understanding long ago. In sum, the plain language of the First Order of Production of Information requires predecessor-in-interest documents, and the testimony of the defendants' two primary records managers supports that conclusion.

The predecessor-in-interest documents have still not been produced. The defendants all but admit that production with regard to these documents was doomed from the beginning because Perlmutter, the attorney handling the case for Interior's Solicitor's Office, "obviously didn't understand what she had just agreed to" when she stipulated to the production of these documents. Transcript at 1469. The record is replete with testimony stating the predecessor-in-interest documents for the five named plaintiffs have not been produced. *See, e.g.,* Transcript at 197–199; 300; 361–362; 384–385. The defendants do not contest this proposition.

The amount of time, effort, and money required to produce predecessor-in-interest documents, as required by the court's November 27, 1996 Order as stipulated to by the defendants, can only be categorized as substantial. The testimony of every witness that testified on this topic supports that conclusion. The defendants in their brief admit that the document production outstanding "is significant in terms of the time it will take" to produce. Defendants' Response at 30. Arthur Andersen, who the defendants have contracted with to continue the document production efforts, stated that searching for predecessor documents could "add a significant amount of time" to the compliance effort, and unequivocally stated that the process would be "significantly more expensive." Transcript at 560, 564. Christie, formerly the head of document production for the Office of Special Trustee, stated that the predecessor search would "greatly" expand the efforts needed for a document production that would be responsive to paragraph 19 of the First Order of Production of Infor-

---

6. The court has already rejected this interpretation. *See supra* section III(C)(1).

mation. Transcript at 728. No testimony from the contempt trial controverts these evaluations of the predecessor-document production effort. Therefore, in summary, the defendants have failed to produce a set of documents required by a court order (to which they stipulated), and all of the testimony elicited at the contempt trial confirms the defendants' representation in their brief that this omission is substantial. Based on this alone, the defendants have clearly failed to meet their burden of showing that they substantially complied with the court's orders.

Third, the defendants have not shown substantial compliance because many documents which have now been produced to the plaintiffs were provided well beyond the June 30, 1998 deadline imposed by the court's May 4, 1998 Scheduling Order. Although the defendants have fallen well short of substantial compliance even if the deadline were set from the time of the contempt trial, the noncompliance is even more stark when viewed from the appropriate vantage point—June 30, 1998. According to the representations of plaintiffs' counsel at the contempt trial, approximately 9,000 pages of documents have been produced since the issuance of this court's Order to Show Cause. The Order to Show Cause was issued on December 19, 1998, almost six months after the deadline for document production had passed. In comparison, plaintiffs' counsel represented that only 5,000 documents had been provided prior to the Order to Show Cause, even though the original document production order was issued two years before. The Department of the Treasury was not even asked to produce canceled checks until early November 1998. *See* Transcript of November 24, 1998 Status Hearing, at 172–173. The defendants have provided nothing in the way of evidence or representations to controvert plaintiffs' counsel's representations, even though they bear the burden of proving the sub-

stantial production component of their defense.

Potential reserves for new documents were even being revealed as late as the contempt proceedings. Christie testified that he was told by the Solicitor's Office that the Department of the Treasury had approximately 20,000 cubic feet of boxes containing potentially relevant records. Transcript at 777–78. When Christie contacted a Department of the Treasury employee about these records, Christie was told that the records were going to be destroyed. Christie informed Treasury that the records could not be destroyed and that OST would take possession of them, as they were potentially relevant to the IIM litigation. Transcript at 778. The next time Christie spoke with the Department of the Treasury employee, the number of cubic feet of records had been reduced to 8,000. Transcript at 778. Although Christie has no reason to believe that the change in document estimates is due to destruction, he also admits that the Treasury documents were never given to OST. Transcript at 778. The defendants admit that these documents have not been either searched or produced, but they still proclaim nonetheless that they have no reason to believe they are responsive.[7] Transcript at 849. Only in this litigation could it happen that 8,000 cubic feet of potentially responsive documents could slip through the cracks. In this regard, the Department of the Treasury has failed to meet its burden of showing substantial compliance.

This spike in last-minute document production activity by a contemnor facing a contempt finding is not a new tactic. The words of the district court in *Aspira v. Board of Educ.*, 423 F.Supp. 647, 654 (S.D.N.Y.1976), apply perfectly to the facts of this case. In *Aspira*, the court summarized the defendants' actions in the following manner:

> [The defendants] have displayed an evident sense of nonurgency bordering on

7. *See infra* note 14.

indifference, contrasting vividly with the spurt of activity on the heals of plaintiffs' motion for a finding of contempt. *See id.* Given the compensatory component of civil contempt proceedings, the defendants cannot be allowed to produce a flurry of papers six months past the proper deadline and then argue that they have substantially complied. Therefore, the defendants have failed to prove substantial compliance with this court's order in that they have produced nearly twice as many documents since a point six months past the deadline for compliance.

Fourth, the defendants have failed to show substantial compliance in that the testimony given at trial indicates that much of the defendants' document search excluded a vast universe of other documents that must be produced under the existing court orders. Specifically, the defendants based the bulk of their search on an IIM database which generally includes only IIM transactions from 1985 forward. *See* Transcript at 415 (describing the database). Paragraph 19 of the First Order of Production contains no such limitation of time on the relevant documents. Other paragraphs of that order do contain time restrictions. *See* First Order of Production ¶¶ 1, 4, 5, & 6. The testimony elicited at trial confirms that the defendants confined a large part of their document production to transactions occurring on or after 1985, either explicitly by instruction or implicitly by reliance on the IIM histori-

cal database. *See, e.g.,* Transcript at 123–24 (explicit reliance), 415, 462, 1040, & Plaintiffs' Exhibit # 8 (reliance on IIM historical database). The defendants have clearly ignored the plain language of the order in this regard. Thus, to the extent that the defendants did not do the necessary work to obtain documents predating 1985, the defendants are in even further noncompliance. This noncompliance consists largely of documents probably housed at either Federal Records Centers or the Federal Archives.

Fifth, and finally, several additional categories of documents were not produced by the defendants, even though these documents were clearly required by paragraph 19 of the First Order of Production of Information. These additional categories of documents are: (1) financial transaction documents from the Office of Special Trustee's facilities in Albuquerque, New Mexico;[8] (2) platte and tract books; (3) short-term leases; (4) trust patents; (5) probate information; and (6) canceled checks. Adding this list of largely unproduced documents to the previously mentioned categories of predecessor information and documentation predating 1985, it becomes clear that the defendants have come nowhere close to substantially complying with this court's orders of November 27, 1996 and May 4, 1998.

For these reasons, the court finds that the defendants have not proven that they substantially complied with paragraph 19

---

**8.** The financial documents currently cannot be produced because of the potential danger of hantavirus contamination in the Hawkins and Commons facilities in Albuquerque. While the safety of the defendants' employees is paramount, the hantavirus problem does not affect the court's contempt analysis with regard to the Albuquerque documents. The defendants do not contend that the Albuquerque hantavirus problem arose before June 30, 1998, as there is no evidence in the record to support such an argument. Apparently the defendants became aware of the potential for hantavirus contamination in late July 1998. *See* Transcript of November 23, 1998 Hearing, at 52. The defendants estimate that the Hawkins and Commons facilities hold thou-

sands of uninventoried boxes of IIM documents. Bradley Preber of Arthur Andersen testified at the contempt trial that, under defendants' proposed document production plan, it would take three weeks to simply assess the scope of documents and then report back to the court as to the time required for actual production of the documents. Transcript at 547; Defendants' Exhibit # 25. This three-week time period would not begin until the hantavirus clean-up is completed. Thus, it is safe to say that these thousands of boxes of documents will not even be searched for relevant documents, and documents will not be produced for another several months, despite the court's November 27, 1996 order.

of the court's First Order of Production of Information and the court's May 4, 1998 Scheduling Order. Based on this finding, the defendants, "good faith substantial compliance" defense cannot absolve themselves from a finding of civil contempt. Instead, the court must now turn to the "good faith" component of the defense, as it is relevant in terms of mitigation. *See Food Lion,* 103 F.3d at 1017–18. The story, however, only takes a turn for the worse in this regard.

(b) *No Good–Faith Attempt to Comply*

■ To meet the second component of the "good faith substantial compliance" defense to a prima facie showing of civil contempt, the defendants must show that they took "all reasonable steps within [their] power to comply with the court's order." *Id.* at 1017. The defendants bear the burden of proving this defense. *See id.*

■ The facts of this case belie any showing of good faith. The court will detail below the specific bases for this finding. But before turning to that discussion, a few contextual notes should be mentioned with regard to the defendants' posture in this case because these points bear upon the good-faith analysis. Although none of these points formally alter the general good-faith standard as described above, they do signal what "all reasonable actions" should have been, and in that sense provide a context for discussion.

First, the case underlying this contempt proceeding is essentially a trust administration action in which the beneficiary seeks an accounting. The court does not want to address at this point the detailed statutory and common-law trust duties owed by the government as trustee to the individual Indian beneficiaries; nonetheless, it is basic hornbook law that the trustee has the duties of retaining trust documents, keeping records, furnishing information to the beneficiary, and providing an accounting. *See* GEORGE T. BOGERT, TRUSTS §§ 140–142 (Practitioner's ed.1987).

Given these types of duties, it is clear that document production in this case is even more important than it might be in many other types of garden-variety lawsuits. From this principle it logically follows that the defendants and their attorneys must be even more vigilant and forthright in their document production efforts and in the representations they make to the court in this regard.

Second, the court notes that this is also a class action lawsuit involving nearly 300,000 Indian beneficiary plaintiffs. "[S]uch litigation places greater demands on counsel in their dual roles as advocate and officers of the court. Because of the complexity of legal and factual issues, judges will be more dependent than ever on the assistance of counsel, without which no case-management plan can be effective." MANUAL FOR COMPLEX LITIGATION § 20.21, at 24 (3d ed.1995). In short, good faith efforts are needed in this case even more than the average piece of litigation. Such efforts have been totally lacking to date.

Third, this civil contempt proceeding includes the Secretaries of the Department of the Interior and the Department of the Treasury, in addition to an Assistant Secretary of the Department of the Interior. Unfortunately, the contemptuous conduct arises out of intra-departmental finger-pointing compounded by case mismanagement by the attorneys. Intra-departmental bickering—*e.g.,* the Office of Special Trustee did not pull financial records because it did not have the proper funding; the budget office would not give the funding because the Office of Special Trustee had not submitted an acceptable budget plan—does not relieve the defendants from a finding of civil contempt. Defendants' counsel summarized the point in closing arguments as follows:

[W]e have gone through two weeks of putting our people on the stand, and frankly, yeah, it's an embarrassment, what we have had to do. Office of the Special Trustee, BIA, Joe Christie, Mr. Scrivner, everybody, they're all part of

DOI, they're all us. . . . [B]y putting that proof on, we're not proving an excuse, we're proving an explanation.

Transcript at 1466. While "revealing your warts" is an honest and commendable theory of constructing a defense, it does not provide a vehicle for proving good faith—especially when several of the attorneys in the underlying action have acted incompetently and with a shocking lack of candor to this court. When one agent of a defendant blames another co-agent, that testimony merely helps prove a civil contempt case against the principal. In this case, the principals bearing the consequences of this conduct happen to be two cabinet level Secretaries and an Assistant Secretary. This is only appropriate, however, because the named defendants are the individuals with the authority over (and responsibility for) all of the defendants' employees.

With these three introductory notes in mind, the court now turns to an analysis of whether the defendants can meet the good-faith standard of taking "all reasonable steps within their power" to comply with paragraph 19 of the First Order of Production of Information of November 27, 1996 and the Scheduling Order of May 4, 1998. The court finds that the defendants have failed to meet this burden.

At no time, from the inception of the document production until the present, have the defendants taken or reasonably attempted to take "all reasonable steps within their power" to comply with this court's First Order of Production of Information. The history of noncompliance can be broken down into three time periods, each with their own distinct flaws. At the outset, once this court issued the stipulated production order on November 27, 1996, the attorneys handling the matter misinstructed their clients on the scope of document production. Next, the various relevant agencies within the Department of the Interior and the Department of the Treasury acted upon improper advice from their attorneys. But the field managers cannot be absolved from blame for defendants' noncompliance, as they, too, had seen the language of this court's order. As the evidence at trial showed, the defendants languished in a period of intra-departmental bickering and stagnation, while all along they were cognizant of the court's outstanding orders. Finally, once the defendants realized that they were not in compliance, their attorneys made a fundamental mistake—instead of choosing to be open and honest with the court, they chose to cover-up the problems. When viewed in this manner, the defendants have made unreasonable choices and taken untenable positions at every major juncture. In short, the defendants have fallen far short of attempting to act in a reasonable, good faith manner.

(i) *The Defendants Failed to Take All Reasonable Steps Within Their Power When They Unreasonably Mishandled the Document Search from the Outset, in Defiance of Court Orders*

On November 27, 1996, the court entered the stipulated First Order of Production. The initial stages of this litigation have been described as "the cooperative times," because both sides started out working together toward the common goal of reaching an accounting in the retrospective component of this action. The defendants freely admit that they cannot provide a full accounting to all Indian IIM beneficiaries. So, as was the case with the tribal trust fund reconciliation, the government and the plaintiffs worked toward developing a sampling approach that, at least in their view, would fulfill the government's duty of providing an accounting. This joint attempt eventually perished, however, because of the state of document production.

Willa Perlmutter, at the time a Solicitor's Office's attorney for the Department of Interior, was placed in charge of document production. She had been the primary person in charge of negotiating the language of the first production order.

Transcript at 1255–56. In the words of defendants' counsel in closing arguments, "Ms. Perlmutter obviously didn't understand what she had just agreed to." Transcript at 1469. To comply, Perlmutter turned to the two records managers for document production—Joe Christie, (former) Special Assistant to the Special Trustee, OST; and Larry Scrivner, Chief, Division of Real Estate Services, BIA.

On December 26, 1996, already one month past the entry of the first production order, Perlmutter sent a memorandum to Scrivner, in which she quoted the language of paragraph 19. *See* Plaintiffs' Exhibit # 1. It was Scrivner's job to then pass the document production instructions on to the area offices that held any responsive information as to the five named plaintiffs or any of their predecessors in interest. At this point, Scrivner and Perlmutter sealed the defendants' fate. Instead of instructing the area offices to pull all documents that relate to the IIM accounts of the five named plaintiffs or their predecessors in interest, a memorandum was sent out from Terry Virden, one of Scrivner's superiors, instructing the areas to pull "all ownership and income producing source documents" for the "five named plaintiffs." *See* Defendants' Exhibits 1–5. Perlmutter approved this instruction. Transcript at 1263. By this action, the defendants had already unreasonably altered the document production order's requirements in two major ways: first, as the defendants now admit, "ownership and income producing source documents" is not the equivalent of "all documents" that relate to an IIM account; second, this language completely excludes the requirement of searching for predecessor-in-interest documents. Hence, the defendants put themselves in a posture for noncompliance from the beginning. When Scrivner and Perlmutter wrongly instructed the area offices on which documents to pull, there was little hope of receiving a substantial portion of the relevant BIA documents.

Scrivner admitted at the contempt trial that his awareness or understanding of the phrase "predecessors in interest" changed as the case progressed. *See* Transcript at 95. More specifically, Scrivner came to understand that the phrase did not connote merely immediate predecessors, but remote predecessors as well. *See id.* Unfortunately for the defendants, neither Scrivner nor Perlmutter (nor any of their attorneys from the Department of Justice) sent out another memorandum supplementing the original instructions on which documents to produce. *See* Transcript at 96. Scrivner asserted at trial that he gave these instructions verbally to the area directors; yet, he could only specifically remember talking to one area director, and he remembered that conversation only because that director had called him about predecessor documents. Transcript at 97–98. In contrast, when all of the area directors were asked whether they were ever instructed to pull predecessor-in-interest documents, they unequivocally stated that they were not, clearly rejecting the notion that Scrivner had orally instructed them to the contrary. Even the sole area director that Scrivner claims to have remembered instructing did not corroborate Scrivner's story. Moreover, superceding memoranda drafted by Scrivner and one of his superiors, Hilda Manuel, omitted any reference to predecessor-in-interest document production instructions. *See* Defendants' Exhibit 15 (memorandum drafted by Scrivner); Defendants' Exhibit 18 (memorandum from Manuel). When this was pointed out to Scrivner at the trial, he admitted that these memoranda would supercede any oral instructions that he may have given. *See* Transcript at 126, 134. The court concludes, in any event, that no such oral instructions were ever given.

In summary, from the time the court's first production order left the courthouse until the instructions left BIA headquarters, a substantial universe of documents clearly required by the court's order was improperly omitted. It cannot be argued that there was even an attempt made to

produce these materials, as no one can remember ever receiving such an instruction from Scrivner and, even it they had, such an instruction would have been superceded by subsequent memoranda.

The absence of good faith becomes even more apparent on the financial side of the document production structure. Unlike the BIA scenario, Perlmutter never sent a memorandum to Christie, who was the head of the document production for OST, as to what documents should be pulled. These instructions took place verbally, and the substance of this discussion was one of the few points of genuine factual dispute at the contempt trial.

Christie claims that in late December 1996, he had a conversation with Perlmutter regarding the document production for the five named plaintiffs. Transcript at 726, 829. Christie testified that, in this conversation, he explained the costs of producing the documents for the five named plaintiffs separately from producing the documents for the statistical sample that all parties were cooperatively working on at the time. *See* Transcript at 726. Christie stated that it would be more efficient to simply produce the documents for the five named plaintiffs at the same time as the larger sample because both searches, despite the disparity in the number of relevant IIM account holders, would involve searching essentially the same storage facilities. Transcript at 726. Because there is no reliable inventory of IIM documents, items for any one beneficiary could be found in any box in which IIM documents are housed throughout the country. According to Christie, Perlmutter instructed him to hold the separate document production for the five named plaintiffs in abeyance until a final decision was made regarding Christie's concerns. Transcript at 726. From that point, late December 1996, until February 1998, not another word was mentioned to OST with regard to producing documents responsive to paragraph 19 of the First Order of Production of Information, in Christie's

view. Transcript at 765. Perlmutter, on the other hand, contends that the conversation never happened.

Based on the evidence put forward at the contempt trial and the surrounding circumstances, the only reasonable conclusion to be drawn is that Christie's testimony is accurate. This finding carries significant consequences, as both parties recognize that the decision to hold the document search in abeyance for the entire financial side of the IIM accounting system unreasonably contravenes the court's original order to produce the documents for the five named plaintiffs "as soon as practicable," and it directly contravenes the May 4, 1998 Scheduling Order to produce these document by June 30, 1998.

Christie's testimony is corroborated by direct and circumstantial evidence. First, Paul Homan, the former Special Trustee, credibly testified at trial that Christie told him about Perlmutter's instructions at the time of the conversation. Transcript at 602. Second, several of the witnesses at the contempt trial (most of whom were called by the defendants) testified that they, too, believed that the defendants' approach was to produce the documents for the five named plaintiffs and for the statistical sample at the same time. People who testified to this effect include the former Special Trustee, the Deputy Assistant Secretary for Budget and Finance, Department of Interior, and the Assistant Secretary for Policy, Management, and Budget, Department of Interior. *See* Transcript at 602 (former Special Trustee); 982 (Deputy Assistant Secretary); & Defendants Exhibit # 7 (Assistant Secretary). This corroboration is also consistent with the position that the defendants' attorneys themselves were taking as late as August 1998. *See* Transcript of November 23, 1998 Hearing, at 81 ("[W]e were thinking that it was okay for us to produce documents of the five named plaintiffs as part of our production for the statistical sample.") In fact, the court had

to point out to the defendants at a status conference two months beyond the deadline for production that they could not unilaterally take this approach. *See* Transcript of August 18, 1998 Status Call, at 24–25. Thus, Christie's rendition of his conversation with Perlmutter is substantiated by contemporaneous, direct evidence, as well as circumstantial evidence through the testimony of government witnesses and the arguments of their attorneys.

In addition to the affirmative evidence supporting Christie's testimony, the court notes that Perlmutter's testimony is not persuasive or believable. First, Perlmutter has no direct evidence, either in writing or by corroborating, contemporaneous verbal discussion, of ever giving Christie an explicit instruction to treat the document productions for the five named plaintiffs and the statistical sample separately. On the other hand, such evidence does exist with regard to the BIA, as discussed above. *See* Plaintiffs' Exhibit #1. Second, no other circumstantial evidence supports Perlmutter's claims. Instead, Perlmutter relies on the fact that she was under a court order to produce documents for the five named plaintiffs, which begs the very question at issue, and the bald assertion that she would never put her client in such a contemptuous posture. Transcript at 1282–83. Without re-detailing the way that this case has been handled by the attorneys, including Perlmutter, the court simply states that Perlmutter's statements in this regard are tantamount to saying "trust me." That is something that the evidence simply will not allow the court to do. Third, Perlmutter testified that she thought all of the documents were produced in December 1996—only one month after the issuance of the first order of production—because at that time Christie had sent a batch of "responsive" documents to Department of Justice counsel, Lewis Wiener. Transcript at 1283. The court finds this justification to be totally without merit. The document search that was undertaken at that time by Christie was responsive, but

not to this court's November 27, 1996 order; instead, Christie's search was responsive to an Arthur Andersen document request that was issued prior to the time that the First Order of Production of Information was entered. Transcript at 725. In short, the documents Perlmutter relies on were searched before the relevant order was even issued, which undercuts the idea that this early production by Christie could possibly have been thought to satisfy the court order. But the fourth, and final, point regarding Perlmutter's testimony is perhaps the most persuasive. Perlmutter admits that she was the agency attorney in charge of document production for the defendants. She also testified that she reported to her supervisor at the Solicitor's Office, Ed Cohen, constantly. Transcript at 1296. The two generally discussed Perlmutter's assigned task—document production. Yet, while Perlmutter testified that she discussed with Cohen the document production efforts with regard to the statistical sample, she never discussed with her superior the document production with regard to the five named plaintiffs, despite an outstanding court order. Transcript at 1296–98. For these reasons, the court finds Perlmutter's testimony regarding her instructions to Christie to be totally incredible.

Like BIA and OST, the Department of the Treasury mishandled the document production in this case from the outset. In August 1996, before the issuance of the First Order of Production of Information, the Department of the Treasury agreed, at the request of the plaintiffs, to preserve microfiche copies of checks relating to the IIM system. Transcript at 43. Under the NARA standards of the National Archives Act, the Department of the Treasury would retain IIM checks for only six years and seven months; once that time passed, the checks would be destroyed. Transcript at 41–42. Thus, since the preservation agreement arose in August 1996, which suspended the application of the NARA standards, the Department of the

Treasury should have kept IIM checks dating back to January 1990.

In yet another blunder, the defendants disregarded their prior preservation agreement with the plaintiffs. In August 1997, one year after the preservation agreement (and nine months after the First Order of Production of Information), it came to the Department of Treasury's attention that "several months" of the supposedly maintained microfiche were missing. Transcript at 44. In fact, up to August 1997, the preservation agreement had been totally ignored; the first eight months of documents set for destruction under the NARA standards (*i.e.*, checks from January 1990–August 1990) were indeed destroyed in due course. Transcript at 45.

Although the defiance of the preservation agreement with the plaintiffs does not directly amount to contempt, it does provide evidence of two points. First, there was a set of Treasury microfiche that were subject to the preservation agreement and this court's first production order. Those checks destroyed which were dated between April 1990 and August 1990 are documents that were required to be produced by the court's first production order, and were also required to be kept by the parties' preservation agreement, but which were destroyed. These documents were, of course, never produced. Had Treasury taken "all reasonable steps within their power" to comply with the court's First Order of Production of Information, then they would have produced the responsive documents that should have been maintained.

Treasury's failure in this instance, like BIA's and OST's initial failures, is attributable to poor instruction from management level officials. The person who agreed to the preservation order simply never told the people responsible for destroying the documents not to carry out their normal duties. Transcript at 57. While this is certainly not the last major mistake the Department of the Treasury made in its history of noncompliance, it is indicative of their overall performance in this litigation.

In summary, the defendants failed to take all reasonable steps within their power to comply with this court's orders of November 27, 1996 and May 4, 1998. The defendants proposed a stipulated order to the court and then immediately improperly instructed their field personnel on what documents were required to be produced. These actions meant that, from the outset, neither pre–1985 documents nor predecessor-in-interest documents would be pulled from the entire BIA side of the production effort, despite their obvious inclusion in paragraph 19 of the First Order of Production of Information. Moreover, OST, which generally makes up the entire financial side of the production effort, was instructed to hold all document production for the five named plaintiffs in abeyance, in direct contravention of this court's orders. This abeyance order was the equivalent of an order not to produce, for a period of over one year, since it was never followed with a superceding order to the contrary. This meant that the entire financial side of document production, in a trust accounting action, was not even instructed to be produced by the defendants to their field employees, despite an outstanding court order. Finally, the Department of the Treasury was busy destroying checks potentially responsive to this court's first production order that it had promised to maintain. For these reasons, the defendants have already failed in their attempt to meet their burden of showing good faith substantial compliance. Unfortunately, their lack of good faith does not end there.

(ii) *The Defendants Failed to Take All Reasonable Steps Within Their Power When They Engaged in a Pattern of Intra–Departmental Bickering That Knowingly Precluded Reasonable Compliance with Court Orders*

The defendants' approach at the contempt trial was to show an "explanation,

not an excuse." Transcript at 1466. A timely explanation most assuredly would have prevented a finding of civil contempt, but an overdue explanation—which itself does nothing more than substantiate an absence of good faith—cannot unring the bell. The proof at trial largely showed a conflict between OST and the budgeting office of the Department of the Interior. OST failed to use funds that defendants admit they had at their disposal to put toward complying with this court's orders. The defendants also failed to properly request funding known to be needed in order to bring themselves into compliance, or at least attempt to do so. While individuals acting on behalf of the defendants may be able to rightfully point a finger at another person acting on defendants' behalf, this does nothing in the way of avoiding civil contempt.

Despite OST's failure to substantially produce documents for the five named plaintiffs, which was based on instructions from the Solicitor's Office, Christie (on behalf of OST) readily admits that he saw the court's First Order of Production of Information in November 1996. Transcript at 724. In Perlmutter's words, the order "speaks for itself." Transcript at 1320. OST blames its inaction after learning of the separate production requirement, however, on Interior's budget officers—Berry and Lamb.

In 1996, OST asked for $10 million for a central records facility that would have put the defendants on track for document production compliance, while simultaneously achieving trust administration reform. Transcript at 605. That request was deferred until the next year by the budget office because it was an untimely request. OST made the same request the following year but received nothing. Transcript at 605. In May or June 1998, once OST was finally instructed by the Solicitor's Office that document production for the five

named plaintiffs must take place separately from the sample's document production, OST believes it made another budget request in an attempt to bring the defendants into substantial compliance. Both Homan and Christie testified that in May 1998 OST requested $1.6 million, as the amount needed to substantially comply with this court's document production orders of November 27, 1996 and May 4, 1998.[9] Transcript at 641, 683, & 750. In OST's view, this appropriate budget request was rejected by Interior's budget office, thereby precluding compliance. OST points to a May 11, 1998 memorandum from the Assistant Secretary of Policy, Management, and Budget, Department of the Interior, to the Special Trustee as evidence of the denial. *See* Plaintiffs' Exhibit # 7. In that memorandum, the Assistant Secretary stated the following:

> The current demand is to produce documents for five accounts—the accounts of the five named plaintiffs. This request has been outstanding since November, 1996. It has always appeared more efficient to collect these records as part of the statistical sampling. Although it should have been clear that this approach involved some risk, it appeared at the time the risk was minimal. Now, the court has ordered that these documents be collected by June 30, 1998. However the only effort required is to gather the relevant documents. *No research or analysis is required.*

*Id.* (emphasis added). To Christie, the emphasized language was tantamount to a denial of his budget request because the IIM document production could not possibly be carried out without research and analysis, given the coordination needed between the realty documents at BIA and the financial documents at OST. Therefore, in OST's view, the defendants did not attempt to substantially produce the responsive documents because the budget office

---

9. OST admits, however, that their budget proposal would not have allowed for full compli-

ance by June 30, 1998. Transcript at 663.

of the Department of the Interior would not request the appropriate funds, which OST had explicitly said were needed in order to attempt to comply. The defendants' budget officers knew that OST felt it needed money to comply, they knew that OST was not given any additional money, and they therefore must have known that OST would not attempt to comply. In fact, OST sent a memo to Interior's budget office to this effect on June 29, 1998. *See* Plaintiffs' Exhibit # 8. Christie unequivocally testified that if he had been given the money he requested, he could have complied with the court's order. Transcript at 692. Yet, neither OST nor anyone at the Department of Interior's budget office even suggested that the court be told about these matters. This shows a lack of good faith on the defendants' part.

Similarly, the budget office did what it could at trial to prove (or "explain") the case against itself by rebutting OST's case. First, both Lamb and Berry point out that OST already had sufficient funds at its disposal to comply with the court orders. Specifically, OST had a $2.6 million litigation budget that could have been spent on the document production effort. Transcript at 1221. Moreover, the Special Trustee cold have informally programmed $500,000 without any prior approval. Transcript at 959–960. Second, OST knew of the outstanding court order, and it simply had to submit a budget plan to receive any additional funds. See Plaintiffs' Exhibit # 7. Furthermore, the budget office had decided that a $4.65 million supplemental funding, which was originally procured for the statistical sample, could be used for document production on the five named plaintiffs, if necessary. *See id.;* Transcript at 985, 1072. The defendants' budget office defends the decision to deny additional funds to OST on the grounds that OST stated at a June 1998 meeting in Albuquerque that it no longer needed additional funds to carry out the instructions of

the defendants' attorneys.[10] However, this justification seems implausible, given a memorandum from OST to Lamb on June 29, 1998, stating that the defendants were not in compliance or attempting to comply with the court's orders. *See* Plaintiffs' Exhibit # 8; Transcript at 1103.

In summary, the evidence provided at the contempt trial showed the clear picture of two branches of the same governmental agency blaming each other. Both branches knew of the outstanding court orders. OST felt that it had been denied necessary funding to facilitate compliance. The budget office felt that OST already had adequate funding and, at any rate, had never made an appropriate budget request. Both of the competing branches report to one of the named defendants in this contempt action—the Secretary of the Interior. The Secretary and his staff clearly did not take all reasonable steps within their power to comply with the court's orders.

(iii) *The Defendants and Their Attorneys Failed to Take All Reasonable Steps Within Their Power When They Made Illegitimate Representations to This Court, Failed to Correct Past Misrepresentations, and Prevented Pertinent Facts from Being Revealed*

To put the conduct in terms of representations to this court in perspective, it is helpful to begin with the admissions made by the defendants and their attorneys. At the outset of the contempt trial, defendants' counsel noted that "[w]hat you are going to hear ... is not exactly a great story." Transcript at 16. "As a department, we have not performed." Transcript at 17. The court has already detailed the ways in which the document production itself has been mishandled. The second primary way that this entire process has been mishandled, however, is

---

**10.** The court notes that the approach agreed to by defendants at that meeting was clearly not a good faith effort, as it excluded two named plaintiffs and relied exclusively on the IIM historical database, which would include documents dating back only to 1985.

in the total lack of coordination and oversight. For each of the mistakes described above, the lack of good faith is amplified because these errors were completely and unreasonably overlooked (or simply never mentioned) by those people in supervisory positions. The blame in this regard must fall upon the Department of the Interior's and Department of the Treasury's management, the Department of the Interior's and Department of the Treasury's Solicitor's Office, and the attorneys handling this case for the Department of Justice. Despite all of these entities' knowledge of the mishandling of the document production, which clearly contravened this court's orders, no one voluntarily came forward to apprise the court or the plaintiffs of the defendants' unwillingness and self-inflicted inability to comply. An exchange between the court and defendants' counsel in closing arguments of the contempt trial summarizes this point aptly:

[The Court:] Well, then why didn't the lawyers come back to me and say, "The Secretary can't get it done. The Office of Special Trustee isn't doing it?" But instead the lawyers came to me—and I'll tell you, I'm very troubled by the conduct of the lawyers too. . . .

[Mr. Brooks:] That's right, and that brings me to my second apology, the apology on behalf of the Department of Justice. There's no question that Your Honor should have been informed earlier, much earlier, and clearly, that we weren't going to be able to comply.

Transcript at 1468. The discussion below will highlight some of the conduct behind these admissions. This conduct evidences baseless representations as to deadlines and a total lack of candor to the court.

On December 6, 1996, the court held a hearing to address the defendants' failure to produce certain information by dates agreed upon by the parties but not ordered by the court. The defendants represented at that time that "the specific information [plaintiffs] are looking for on the five named plaintiffs . . . will be ready

next week." Transcript of December 6, 1996 Status Call, at 8. Based in part on representations such as this, the court declined to set a firm deadline for document production under the First Order of Production of Information. Instead, the court ordered the defendants to file a written status report on December 27, 1996, detailing any information that had not been produced and informing the court when that information would in fact be produced. *Id.* at 12–13. Little did the court know— that is, until the contempt trial—that Perlmutter, from the Solicitor's Office, had not at the time even directed BIA to respond to the court order. It was not until the eve of the deadline for the status report that Perlmutter so informed BIA about the original court order. *See* Plaintiffs' Exhibit # 1. Moreover, unlike the BIA, OST had not even been contacted in conjunction with making a representation to the court as to when IIM documents would be produced. Transcript at 753–54. This held true for nearly all subsequent representations. *Id.* Thus, the defendants' representations in this regard turned out to be extremely unreliable.

In a December 27, 1996 Status Report, defendants' lead counsel represented to the court that the responsive documents would be produced within sixty days. December 27, 1996 Status Report, at 7. By this point, however, counsel from the Solicitor's Office had already instructed OST to hold document production in abeyance, and BIA had been sent off to search for documents of a scope far narrower than what was clearly included in the court's First Order of Production of Information. *See supra* subsection III(C)(2)(b)(i). Nevertheless, one month later counsel for defendants eloquently argued to the court:

Your Honor, on December 27 we filed with the court a status report detailing the progress that had been made to date at that time of the production of documents. As you may recall at the last status conference, plaintiffs predicted all kinds of pestilence, war, famine, et cet-

era, et cetera, were the Court not to enter a motion compelling the government to immediately produce documents. None of that happened. In fact, all of the commitments that the government has made as to when it would produce documents, and the documents that would be produced, have been met. In fact, some of the documents were produced early.

Transcript of January 21, 1997 Status Call, at 8. These statements were made to the court at a time when defendants' counsel either knew or should have known, through reasonable oversight of this litigation, that his representations were utterly false.

One month later, on February 11, 1997, Perlmutter filed a status report with the court unequivocally stating that "[t]he information requested in Paragraph 19 of the Order will be provided to the plaintiffs no later than March 3, 1997." February 11, 1997 Status Report (Untitled), at 4. Again, this misrepresentation was made to the court by the very person who sent BIA on a document search substantially narrower than what was clearly required and who knew that the document search by OST for the five named plaintiffs was held in abeyance. The court relied on the falsehoods in its adjudication of document production in this case.

The March 3, 1997 self-imposed deadline came and went. The court held monthly status calls, largely in an attempt to hear the representations of counsel as to the state of document production, as that would affect the court's ability to set a firm trial date in this matter. In a properly managed case, it would have been during this time period that defendants would have advised the court of the improper document searches and internal mishandling of document production. Instead, the court heard statements from the defendants' lead counsel who, in the most favorable light, did not have an understanding on how the courts orders were (or, more accurately, were not) being car-

ried out. Indeed, defendants' counsel went out of his way in open court to commend the defendants on the way the document production was being handled: "I think that recognition needs to be given to the efforts of the Department of Interior and specifically to Ms. Perlmutter, to her dedication to providing plaintiffs with thorough and complete responses to their queries." Transcript of May 19, 1997 Status Call, at 10. The disparity between what was being reported to the court and what was in fact true could not have been greater.

In terms of a good faith analysis, the defendants' and their attorneys' actions up to this point can be characterized as nothing short of contumacious. The document production was proceeding in a manner that clearly contravened this court's First Order of Production of Information, and the defendants' attorneys were representing to the court exactly the opposite. Yet, despite this behavior, the saga became even more disturbing in early February 1998.

On February 3, 1998, Edith Blackwell, who had recently replaced Perlmutter at the Solicitor's Office, sent a letter to Joe Christie of OST, which stated, in pertinent part, the following:

> Joe—
>
> When Lew [Wiener] and I met with [Arthur Andersen] a week or so ago, one of the issues we discussed was the lack of complete documents for the five named plaintiffs. As you know, as part of the court Order dated November 27, 1996, we were ordered by the Court to provide [documents responsive to paragraph 19]. According to Arthur Andersen, we only have a small fraction of these documents.... I need to know the status and or the plan to gather all the documents for the IIM accounts of the five named plaintiffs. Since this was a Court Order, then we could be subject to a Motion to Compel or Sanctions for our failure to produce the documents in over 15 months. DOJ is concerned about

this, and given the parties are no longer cooperating we are very vulnerable to a Motion for Sanctions at this time.

Defendants Exhibit # 26. Thus, the defendants knew that they were not in compliance with this court's order and that their own experts had told them that the document production effort to date had produced few responsive documents. Christie responded with a message that captured the manner in which the document production responsive to paragraph 19 had been handled to date. That message, in pertinent part, read as follows:

> Hold it!!! ... We informed the Solicitor's Office that in order to obtain the transaction documents and reports we would have to go on site at each agency and area office where the materials were located and go through each box of material at those locations in order to find all the materials.... I was told not to do anything until a final decision was made. That decision was never made and or communicated to us as far as I know.... [W]e were told not to proceed with that collection pending a final decision!!! ... The office told us not to proceed, we did as we were instructed.

Defendants' Exhibit # 26. At this point, the defendants unquestionably knew that they were not taking "all reasonable steps within their power to comply" with the First Order of Production of Information. To the contrary, the defendants and their attorneys had actual knowledge that OST—the entity in charge of the entire financial component of the IIM accounting system—was not taking *any* steps to comply with the court's order. Yet, the defendants and their attorneys did nothing to inform the court or the plaintiffs about this situation. Instead, as will be seen shortly, the defendants began to stonewall the court and the plaintiffs from learning this information and unilaterally decided to produce a set of documents that clearly would not comply with court orders.

On April 8, 1998, defendants' counsel informed plaintiffs' counsel that the Tribal Court of the Winnebago Tribe of Nebraska had recently issued a temporary restraining order, purporting to restrain the defendants from removing trust-related documents from BIA's Winnebago Agency. The Winnebago Agency is pertinent to this contempt proceeding because it houses documents for plaintiff La Rose. These documents were ultimately produced on December 18, 1998, nearly six months after the June 30, 1998 deadline. Transcript at 222. As discussed above, the defendants put forward potential hantavirus contamination as an "excuse" for the time period beginning mid-July 1998, which is no excuse at all because it came one month after the document production deadline. *See supra* subpart III(B). For the time period prior to July 1998, however, the defendants improperly relied upon the TRO as their excuse for noncompliance as to plaintiff La Rose's Winnebago documents. This TRO, originally issued in early April 1998, was dissolved on April 30, 1998.[11] Nonetheless, the defendants repeatedly represented to the court, well beyond the TRO's dissolution, that the TRO precluded them from producing Winnebago documents. In fact, the defendants never voluntarily offered to the court that the TRO had been dissolved. It was only upon the court's questioning at the July 21, 1998 status call that defendants' counsel admitted that the TRO had been dissolved. Transcript of July 21, 1998 Status Call, at 21. The defendants never informed the court that it had been dissolved nearly three months earlier. The Winnebago TRO issue is a perfect example of one way this case has been mismanaged by the defendants. Defendants simply made representations to the court, which the court then relied upon,

---

11. *See* Letter from August 11, 1998, from Mark A. Hubble, General Counsel, Winnebago Tribe of Nebraska to the Honorable Royce Lamberth, at 3 (Exhibit # 1A, Plaintiffs' Response to Defendants' Status Report Regarding Document Production at Winnebago, filed August 18, 1998.)

but the defendants never supplemented or corrected the original representations. When the uncorrected representations were relied upon as an excuse for not complying with a court order, then it became even more egregious when they were not corrected. If the court had not asked about the TRO in July 1998, then the defendants would probably still be relying upon it to defend their continuing noncompliance today.

On May 4, 1998, approximately eighteen months after defendants first represented that responsive documents would be completely produced, the court at long last placed a date-certain deadline of June 30, 1998 on compliance with the First Order of Production of Information. As discussed above, *see supra* III(C)(2)(b)(ii), it was during this time that OST and the budget office were sparring over funding for document compliance, despite their knowledge of the court ordered deadline. In early June 1998, Christie put on a demonstration for defendants' lead counsel, Lewis Wiener, to show the great amount of work remaining to substantially comply with the court's orders. Transcript at 732. Instead of bringing to the court's attention the defendants' inability to meet the deadline upcoming later that month, the defendants decided to silently take an approach that would simply ignore paragraph 19 and the June 30, 1998 deadline. *See* Plaintiffs' Exhibit # 8. Specifically, defendants' lead counsel instructed OST to take a "phased" approach to production (and, hence, compliance). *Id.;* Transcript at 733. Only the first phase of the defendants' unapproved and undisclosed approach even purported to be produced by June 30, 1998. In this meager first phase, Wiener instructed Christie to pull financial documents based solely on transactions reflected on the IIM post–1985 database. *Id.* The defendants knew that this approach would not amount to compliance. *Id.* Christie asked Wiener to put his phased approach in writing. *Id.* Apparently, Wiener thought better of this idea and never followed through. *Id.* On June 10, 1998, Christie faxed Blackwell, of the Solicitor's Office, stating that he wanted the phased approach in writing. Transcript at 662; Plaintiffs' Exhibit # 8. On June 29, 1998, Christie sent a memorandum to Edith Blackwell of the Solicitor's Office clearly stating that defendants were not in compliance with this court's orders and that there was no way to come into compliance before the deadline the following day. *See* Plaintiffs' Exhibit # 8. Despite all of this knowledge, not a single employee of the defendants nor any attorney from the Solicitor's Office or the Department of Justice came before the court to ask for an appropriate enlargement of time. The behind-the-scenes cover-up was never mentioned. On June 30, 1998, nearly eight months ago, the defendants became guilty of civil contempt of this court's orders of November 27, 1996 and May 4, 1998.

Undoubtedly aware of this state of affairs, the defendants decided to begin a campaign of stonewalling and strained interpretations of the court's orders in a desperate attempt to avoid the penalties that they deserved. Joe Christie revealed, during his May 12, 1998 deposition, that he had not been asked to produce documents for the five named plaintiffs and that he could not possibly comply with that order given the last-minute nature of the instructions from his superiors. *See* Christie Deposition at 216–18. Christie explicitly testified that the attorney from the Solicitor's Office, Perlmutter, had instructed him to hold document production in abeyance, despite the court order. When the plaintiffs sought to depose Perlmutter and other high-level Department of Interior employees regarding these statements, the defendants immediately responded by seeking to quash the depositions in their entirety based on the attorney-client privilege, despite their knowledge of the true facts and propriety of these depositions. See Defendants' Motion to Quash, for Protective Order, and for Expedited Consideration. Second, it finally became apparent to the court that the defendants were taking the

unjustifiable position that they had taken from the beginning—that the document production for the five named plaintiffs could be done along with the defendants' statistical sample. On August 18, 1998, the court informed the defendants that they were not simply free to disregard the court's orders. *See* Transcript of August 18, 1998 Status Call, at 24–25. At this time, even though the defendants admitted in substance that they are not in compliance with court orders, there is no motion for an enlargement of time or motion to amend the court's pending orders.[12] A May 11, 1998 memorandum from the Assistant Secretary, Policy, Management, and Budget, Department of Interior to Joe Christie, OST clearly evidences defendants' awareness that, if the parties' joint sampling agreement fell through, the defendants would be left in contempt of court. *See* Plaintiffs Exhibit # 7 ("The current demand is to produce documents for five accounts—the accounts of the five named plaintiffs. This request has been outstanding since November, 1996. It has always appeared more efficient to collect these records as part of the statistical sampling. Although it should have been clear that this approach involved some risk, it appeared at the time the risk was minimal. Now, the court has ordered that these documents be collected by June 30, 1998." (emphasis added)). The known "risk" has come to fruition, and the defendants' employees and attorneys have left two cabinet level Secretaries and an Assistant Secretary exposed to a finding of civil

contempt. Third, defendants' counsel urged that the court's orders required either documents for the five named plaintiffs or predecessor-in-interest documents, but not both. The court has already rejected this interpretation, which is clearly at odds with the plain language of the First Order of Production of Information, especially in the context of this lawsuit. In short, the defendants chose to take these types of approaches rather than the straightforward, honest route. The latter may have allowed the defendants to avoid a finding of civil contempt; the prior assures one.

In short, the defendants have failed to make a good faith attempt to comply with this court's orders because they have made numerous illegitimate representations, failed to correct known misrepresentations, and neglected to inform the court at every turn about self-inflicted obstacles to compliance. Even Assistant Secretary Berry testified that he is "aware that there have been numerous representations that haven't been met." Transcript at 1200. Although all attorneys for all defendants knew of the outstanding court orders, and even though defendants' management level employees were also aware of the same, none of these people thought to inform the court.[13]

OST and BIA knew of the court orders all along, as did their attorneys. The Department of the Treasury was never even asked to produce a check until the docu-

---

12. The court recognizes that in late August 1998, defendants filed a motion to amend the court's production orders. *See* Defendants' Motion to Amend or Modify the Court's November 27, 1996 and May 5, 1998[sic] Orders. A dispute exists on whether this motion was withdrawn by agreement of the parties. Although the court clearly never granted the motion to modify, the court notes that a finding on this issue is unnecessary. The defendants' motion to amend came well after the deadline for compliance had passed.

13. The court is cognizant of the Department of the Treasury's argument that it was dependent upon the Department of the Interior for

certain information before it could begin its document production. This argument would have relieved the Department of the Treasury of their duties to produce documents had it been raised before June 30, 1998. But it cannot suffice that the Department of the Treasury raises this argument as a defense in a contempt trial, seven months after the passage of the document production deadline. *See Food Lion,* 103 F.3d at 1019 (upholding a finding of contempt against a contemnor who alleged the defense of good faith substantial compliance because the contemnor's production came ten days past the court-ordered deadline).

ment production deadline had passed by five months, in addition to still not searching 8,000 cubic feet of potentially responsive documents.[14] Viewed even in the most favorable light, the defendants have shown a reckless disregard for the orders of this court.

It must be noted that there was a substantial amount of evidence produced at the contempt trial that suggests the defendants' misconduct rises above the level of "reckless disregard." The court has chosen not to make an explicit finding on the issue of willfulness, partially because such a finding is unnecessary, as a contemnor need not intentionally violate a court order in order to be held in civil contempt. The court cannot, however, be oblivious to these instances of willful dereliction. First, as discussed above, the Assistant Secretary stated in a written memorandum that he knew of the risk that was being undertaken by ignoring the court's orders and instead gambled that a joint statistical sample with the plaintiffs would be the chosen methodology. *See* Plaintiffs' Exhibit # 7. Second, Edith Blackwell, an attorney with the Solicitor's Office, stated in an e-mail that she knew in February 3, 1998 that the defendants were "very vulnerable" to sanctions for their noncompliance with the court's orders. Despite the

knowledge evidenced in these two examples, actions were taken that continued to send the defendants down the path of contempt. These statements and corresponding actions are direct evidence of conduct that comes perilously close to *criminal* contempt of court. Although the court has attempted to couch all of the language in this opinion in terms of a "lack of good faith," a strong case can be made for an intentional disregard of court orders. Defendants must understand that future contempt actions in this case may not be treated as civil contempt.

The defendants have failed to meet their burden of showing good faith substantial compliance. Accordingly, a finding of civil contempt pursuant to Rule 37 of the Federal Rules of Civil Procedure is appropriate.[15]

## IV. *Relief*

Given the egregious nature of the defendants' actions in this matter, it should come as no surprise that much of the requested relief is not now contested. The court will begin by touching upon the relief consented to by the defendants and then will turn to the only disputed item of relief sought—a finding of civil contempt.

---

**14.** One day after these documents were brought to defendants' attention, defendants' counsel represented that defendants had obtained indices for the unsearched Treasury boxes and that they would make these indices available to plaintiffs. Transcript at 849. Defendants' counsel further stated that she had no reason to believe that these boxes contained documents relevant to paragraph 19 of the First Order of Production of Information. Transcript at 849. Thus, the testimony in the record shows that Christie, the person in charge of Indian trust-record management for OST, was contacted regarding a substantial number of documents that someone at the Department of Treasury apparently thought could be IIM trust records. If these boxes were indeed IIM trust records, they would need to be searched because any IIM trust-record box could contain documents for one or more of the five named plaintiffs (or a predecessor in interest). Mere representations that counsel has "no reason to believe"

that these boxes contain responsive documents, when it has not been represented that the boxes have been searched (either manually or via the indices), appear to be nothing more than speculation. Given that Christie and a Department of the Treasury employee originally thought the documents could be responsive to the court order, and there being only speculation to the contrary now, the court finds that the testimony shows both a lack of substantial compliance and a lack of good faith with regard to the 8,000 cubic feet of boxes of potentially relevant Department of Treasury documents.

**15.** The case law is clear that the Court should rely on its inherent contempt powers only as a secondary measure. Because Rule 37 applies to this case, an inherent-powers finding is unnecessary. In the absence of Rule 37, however, the court would nonetheless find the defendants to be in civil contempt.

The defendants first concede that they must be ordered to pay reasonable expenses and attorneys' fees. *See* Transcript at 1500. Rule 37 of the Federal Rules of Civil Procedure provides the applicable measure of sanctions in this case. Rule 37 provides, in pertinent part, as follows:

> In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorneys advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or than other circumstances make an award of expenses unjust.

FED.R.CIV.P. 37(b)(2)(E). Defendants have therefore conceded that their actions were not substantially justified within the meaning of Rule 37, and that the circumstances here do not make unjust the court's award of plaintiffs' expenses. Accordingly, the plaintiffs shall be awarded all expenses and reasonable attorneys' fees caused by the defendants' failure to obey the court's orders of November 27, 1996, and May 4, 1998. The amount awarded, however, will exclude the expense of *obtaining* these disobeyed orders. *See* Toth v. TWA, Inc., 862 F.2d 1381, 1385–86 (9th Cir.1988); CHARLES A. WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE, *supra*, § 2289, at 674. The plaintiffs shall submit to the court within 30 days an appropriate filing detailing the amount of reasonable expenses and attorneys' fees incurred to date.

Next, both sides agree that a special master would aid in obtaining compliance with this court's orders. *See* Transcript at 1465, 1504, & 1520–21. Although the court originally expressed its unwillingness to take this action when raised at the outset of the litigation, the court now agrees with the parties in this regard. Pursuant to Rule 53 of the Federal Rules of Civil Procedure, the court will appoint a special master to oversee discovery, document production, and related matters and to effectuate compliance with this court's orders. The defendants simply cannot be trusted to do this job themselves. More alarmingly, their attorneys cannot be trusted to accurately inform the court should compliance become a further issue. A special master who is not burdened with a full docket of other cases needing attention will be able to devote the *daily* —on-site when necessary—attention to the case that is required.

The court notes that, as part of their trial presentation, the defendants proposed a plan that would purport to bring the defendants into compliance with the court's pertinent document production orders by contracting with Arthur Andersen. This proposal itself, even if carried out flawlessly, would not bring the defendants into compliance. Although the court does not wish to micro-manage the defendants' methodology of document production—as that will be now left to the special master in the first instance—it should be noted that the defendants' proposal has several flaws. First, it excludes searching for all predecessor-in-interest documents, which are clearly required by the First Order of Production of Information. Second, the Arthur Andersen plan applies only to the OST; no plan was presented to the court as to how BIA efforts will be carried out. Third, the Arthur Andersen plan appears to rely entirely on the post–1985 IIM database transactions. As explained above, this database generally contains IIM transactions beginning in 1985. There is no such limitation on the court's production orders. In this regard, defendants' witness at the contempt trial, Mr. Brad Preber, testified that if a transaction is not on the computer system, then it will be up to BIA to find that transaction. Transcript at 575–76. Thus, much stronger coordination between the OST and BIA document searches will be required. These three points are not intended to exhaust the problems with the defendants' plan. They simply show that, even as late

as the contempt trial itself, the defendants cannot be trusted to formulate an approach that will comply with clear orders of this court. As such, a special master's appointment is especially appropriate.

Finally, for all of the foregoing reasons, the court finds Bruce Babbitt, Secretary of the Interior; Robert Rubin, Secretary of the Treasury; and Kevin Gover, Assistant Secretary, Department of the Interior to be in civil contempt of this court's First Order of Production of Information, issued November 27, 1996, and Scheduling Order, entered May 4, 1998. As explained above, the defendants admit the plaintiffs' prima facie case of civil contempt. The defendants have fallen far short of proving their alleged defense of good faith substantial compliance. The court has allowed the defendants significant and undeserved flexibility with regard to compliance. Given the disparity between what was required by the court's orders (as proposed by the defendants) and what has actually been done, civil contempt is appropriate. When the defendants' reckless disregard for this court's orders and their attorneys' mismanagement of this case are added, then the court is left with no other viable option aside from a contempt finding. The court at this time, however, will limit compensatory relief to monetary sanctions and coercive relief to the appointment of a special master. Should it appear at any point that the defendants are not taking all reasonable steps to comply with the orders of this court, then harsher relief will be duly administered.

## V. Conclusion

The court is deeply disappointed that any litigant would fail to obey orders for production of documents, and then conceal and cover-up that disobedience with outright false statements that the court then relied upon. But when that litigant is the federal government, the misconduct is even more troubling. The institutions of our federal government cannot continue to exist if they cannot be trusted. The court

here conducted monthly status conferences where plaintiffs complained that the government was not producing the required documents. Because of the court's great respect for the Justice Department, the court repeatedly accepted the government's false statements as true, and brushed aside the plaintiffs' complaints. This two-week contempt trial has certainly proved that the court's trust in the Justice Department was misplaced. The federal government here did not just stub its toe. It abused the rights of the plaintiffs to obtain these trust documents, and it engaged in a shocking pattern of deception of the court. I have never seen more egregious misconduct by the federal government. In my own experience, government lawyers always strived to set the example by following the highest ethical standards that were then a model for the rest of the legal profession, and the Justice Department always took the position that its job was not to win an individual case at all costs, but to see that justice was done. Justice has not been done to these Indian beneficiaries. Moreover, justice delayed is justice denied. The court cannot tolerate more empty promises to these Indian plaintiffs. The time has come for action, and the court will make full use of its powers to ensure that this case gets back on track.

The Department of Justice's handling of this litigation has markedly improved since the issuance of the Order to Show Cause. New counsel, Phillip Brooks, was assigned to handle the contempt proceedings, and he performed this unpleasant task with commendable candor, ably assisting the court in finding the facts and candidly acknowledging most of the problems that the court today discusses. The Assistant Attorney General for the Environment and Natural Resources Division attended the lengthy closing arguments in the contempt trial, where she heard the court express many of its concerns that it details today in this opinion. Shortly thereafter, the Assistant Attorney General personally

filed a memorandum notifying the court of a complete restructuring of the trial team in this case, with new counsel to replace prior counsel, and additional counsel added to help ensure against repetition of the improper conduct the court today describes. The court views this as a hopeful sign, for the future, although it is too late to save the defendants from the contempt citations they have earned today.

After issuance of the order to show cause, Secretary Babbitt decided to reorganize the Office of Special Trustee and remove the key official responsible for document production in OST, Joe Christie. The Secretary did this without any prior discussion with the Special Trustee, prompting the Special Trustee to resign the next day. The Secretary took no action whatsoever to bring BIA into compliance, apparently being advised that there were few problems there and that the contempt problems all were the fault of OST. This opinion should cause Secretary Babbitt to now understand that he was badly misinformed, and that his own inattention to detail and wholesale delegation of authority to individuals who have not served his—or the government's—interest, may cause him future problems with this court if the government misconduct continues.

The court views it as unfortunate for Secretary Rubin that he has been tarnished with this contempt citation. What personal involvement he has had in this fiasco is unknown to the court, but what is clear is that he has totally delegated his responsibility to others and they have miserably failed to comply with this court's orders, as detailed in this opinion.

For the reasons stated above, the Court finds by clear and convincing evidence that Bruce Babbitt, Secretary of the Interior; Robert Rubin, Secretary of the Treasury; and Kevin Gover, Assistant Secretary, Department of the Interior are in civil contempt of this court's First Order of Production of Information, issued November 27, 1996 and subsequent Scheduling Order of May 4, 1998.

In this regard, the court will order that:

1. The defendants are ADJUDGED and DECREED to be in contempt of court.

2. The defendants shall pay plaintiffs' reasonable expenses, including attorneys' fees, caused by the defendants' failure to obey this court's First Order of Production of Information, issued November 27, 1996 and subsequent Scheduling Order of May 4, 1998.

3. The plaintiffs shall submit to the court within 30 days an appropriate filing detailing the amount of reasonable expenses and attorneys' fees incurred to date as a result of the defendants' failure to obey this court's two aforementioned orders.

4. A special master shall be appointed by the court in this case pursuant to Rule 53 of the Federal Rules of Civil Procedure. The special master will be named in a forthcoming order.

5. The special master shall oversee the discovery process and administer document production, compliance with court orders, and related matters. Further duties of the special master shall be set out in a forthcoming order.

A separate order shall issue this date.

### ORDER

For the reasons given in the court's memorandum opinion issued this date, the Court finds by clear and convincing evidence that Bruce Babbitt, Secretary of the Interior; Robert Rubin, Secretary of the Treasury; and Kevin Gover, Assistant Secretary, Department of the Interior are in civil contempt of this court's First Order of Production of Information, issued November 27, 1996 and subsequent Scheduling order of May 4, 1998.

In this regard, the court HEREBY ORDERS that:

1. The defendants are ADJUDGED and DECREED to be in contempt of court.

2. The defendants shall pay plaintiffs' reasonable expenses, including attorneys'

fees, caused by the defendants' failure to obey this court's First Order of Production of Information, issued November 27, 1996 and subsequent Scheduling Order of May 4, 1998.

3. The plaintiffs shall submit to the court within 30 days an appropriate filing detailing the amount of reasonable expenses and attorneys' fees incurred to date as a result of the defendants' failure to obey this court's two aforementioned orders.

4. A special master shall be appointed by the court in this case pursuant to Rule 53 of the Federal Rules of Civil Procedure. The special master will be named in a forthcoming order.

5. The special master shall oversee the discovery process and administer document production, compliance with court orders, and related matters. Further duties of the special master shall be set out in a forthcoming order.

SO ORDERED.